20-1492, City of Oberlin, Ohio Petitioner v. Federal Energy Regulatory Commission, Ms. Elephant for the petitioner, Ms. Benta for the respondent, Mr. Super for the interviewer. Good morning, Council. Good morning, Your Honor. Shall I proceed? Please do. May it please the Court. This is the City of Oberlin, Ohio's second time before this Court challenging the unlawfulness of the Commission's reliance on foreign contracts to justify its approval of the unneeded and undersubscribed Nexus Pipeline, which took city property in eminent domain. In Oberlin 1, this Court reaffirmed that in contrast to Section 7, there's no eminent domain authority for exports under Section 3, and for that reason, this Court remanded the case to the Commission to explain why it is lawful under Section 3 of the Gas Act and the Takings Clause of the United States Constitution for the Commission to credit exports towards a finding of need under Section 7. On remand, the Commission recycled many of the arguments that this Court already found insufficient in Oberlin 1, and further advanced the theory of commingling, which had taken to its logical conclusion would transform any export pipeline into an interstate gas pipeline. Without exports, there's no evidence in the record to show that this 40 percent subscribed pipeline can be sustained, particularly in light of FERC's dubious and black box analysis of the availability of capacity on neighboring pipelines. Let me turn first to the Commission's justification of its reliance on Section 3 exports, with the reminder that FERC's explanation is not entitled to deference to the extent that its explanations implicate constitutional rights. So FERC's first reason for why it relied on Section 7 is essentially one that was already foreclosed by this Court in Oberlin in footnote 2. The Commission says that there's a presumption of public interest findings for exports to free trade nations under Section 3, and that's sufficient to satisfy the more robust standard of Section 7. And the Commission goes on to say it differently. Instead of saying that exports and imports are the same, it says that it can treat precedent agreements for exports basically identically to precedent agreements for domestic use. So that's a different way of saying the same thing, that it's going to credit exports the same way as it would treat domestic use. And again, that's something that Oberlin Court reminded in footnote 2. It said it's not sufficient to consider this public interest standard as enough to satisfy the need under Section 7, because Section 7 includes eminent domain. Now that wasn't FERC's only explanation. It also tried to highlight some of the domestic benefits associated with exports. So for example, the Commission talked about how this pipeline was creating this byway between the U.S. and Canada, and gas would flow back and forth, except there's no indication in the record that this pipeline was anything but a one-way ticket for 260,000 decatherms of gas to go to Ontario and stay there. And in fact, the Commission in its own remand order, paragraph 20, page joint appendix at 377, admits that many of these facts are beyond the scope of the record. Well, let's be clear. The record is clear, is it not, that this gas will pass interstate, all right, at some point. Is that not correct? That is correct, Your Honor. All right. So that's where the Commission begins, it seems to me. And then it says that the fact that some of the gas will proceed as an export is no bar. And it cites some precedent, etc. And I indicated either that those factual findings are clearly erroneous, or that the Commission erred as a matter of law. So there are two issues, Your Honor. The Oberlin Court acknowledged that if a pipeline can stand independent of exports, it can be certificated under Section 7. Well, I wonder in remand whether or not the Court went quite as far as you are suggesting in Oberlin 1. It clearly wanted an explanation. But I didn't understand it, and maybe I'm incorrect. And certainly my colleagues can correct me in saying that the Commission didn't say what you have purported it said, namely that the inter-export aspect of this doomed any Section 7 finding. So, Your Honor, I'm quite certain you are not incorrecting your memory of City of Oberlin. However, in Section 3 of City of Oberlin, this Court said that it disagreed that it can never lawfully issue a Section 7 pipeline if exports are included. However, there needs to be a showing of public convenience and necessity independent of precedent agreements for export. And so our position here is that independent of those export agreements, you've only got a pipeline that's 40% subscribed. And that's what the problem is. FERC never justified that 40%. Well, I don't quite understand that because, first of all, 40%, it has these eight agreements. Secondly, it has this interstate traffic, which the Commission found would provide alternative avenues, etc., for shippers interstate. In other words, don't you have to convince us that by relying at all on exports, the Commission was somehow wrong as a matter of law or clearly erroneous in finding that the interstate aspects and what it found were benefits independent of exports was simply insufficient? So the benefits that the Commission found, again, are not linked to this particular project. This project was designed to provide a seamless path of gas, some of it interstate, and then 260 decatherms to Canada. There's no indication that it was going to flow back and forth or help balance the system or do anything. Well, but my question is, was that necessary as a Well, it was necessary for the Commission to justify why it could rely on exports towards a finding of need. So the Commission gave three reasons. It said it gave this equivalency reason between Section 3 and Section 7 already foreclosed by footnote 2 in Oberlin. Second reason it gave is that there are domestic benefits associated with this gas. We're arguing that 40% of the pipeline is indisputably domestic, but the export portion doesn't have any domestic benefits. That's our second argument. Our third argument is that exports aren't justified because you can't. And what FERC says is that this really wasn't an export pipeline at all. It's interstate because the gas is all commingled. And that commingling theory has never been applied when you're dealing with an interstate pipeline in foreign commerce. That's only for interstate and intrastate. And in fact, commingling for interstate and foreign commerce is foreclosed by Section 717A7 of the Natural Gas Act, which says that gas that crosses state lines is an interstate commerce only so long as that commerce takes place in the United States. So gas going to Canada is commerce that doesn't take place in the United States, and it can't be commingled. So those are the three reasons we gave for why FERC's analysis of why it was able to rely on export pipelines is incorrect. Once you take out the exports, there's no support for just the 40%. As your agreements do carry some weight, but they're not the only solution. If you have a precedent agreement, even for millions and millions of decatherms of gas, but you can show that a pipeline next door can accommodate all that gas, there's no need to build a new pipeline. In this situation, the commission says there's no available capacity on neighboring pipelines to absorb the gas. It says it relied on publicly available information, but we don't know which whether it assumed that this gas was all going to travel together or could be split up to different tracks. It basically just substituted a number for an analysis it had done before. And the Oberlin court also found that fact very significant. It found that if the pipeline was 59% subscribed, that gas couldn't be accommodated on other lines. But that's not necessarily true when there's a lower amount of gas in the pipeline. And finally, the commission also relied on generic arguments for why the pipeline is needed. It'll open up bottlenecks, unbottleneck the infrastructure, allow for development of other gas. And as Commissioner Glick pointed out, those are generic benefits that could be used to justify any pipeline. Can you point us to a case in which we've held that a pipeline didn't serve the public convenience necessity that was subscribed at a 40% rate and that had these benefits that FERC has asserted? So I can't cite the court to a case that affirmed a pipeline that was 40% subscribed, because as we pointed out in our rehearing petition at footnote 18, and also argued in our brief, it's very rare for a 40% subscribed pipeline to even go forward. The Kinder Morgan pipeline, for example, that we discussed in our brief, didn't go forward because it didn't have enough capacity. Most of the cases this court sees are 90% or 100% subscribed cases like Allegheny Voices, EDF versus FERC. And EDF versus FERC, again, as your honors are aware, isn't a similar situation here. We're not arguing that there was self-dealing or even that there was any self-dealing here. But EDF does remind us that there's a need for a cautious and thorough analysis of need under Section 7, because eminent domain rights are implicated. That's in EDF 2F4 at page 961. And so I think the reason these cases have never come before the court is because at least prior to this case, there was a recognition that you had to be able to show some degree of need, and a 40% subscribed pipeline wasn't going to cut it. I see that I am running into my rebuttal time, but I'm happy to answer more questions. All right, counsel for the commission. Good morning. I'm Carol Banta for the commission. I don't know whether the court would prefer that I start with the export issue or the alternative finding at the 42%, but one common thread between both is that when the commission does a Section 7 analysis, and this, make no mistake, is an interstate pipeline that goes from Ohio to Ypsilanti, Michigan. It does not approach or cross the border. And so the commission, as it must, looked at this as a Section 7 pipeline, and I believe that's consistent with City of Oberlin said, if you're going to look at this the precedent agreements that are for export. But when the commission is doing a Section 7 analysis, as it explained in the first case, and the commission or the court upheld the commission on the vast majority of issues, and in particular regarding how it conducted its Section 7 analysis until we got to the export question, the court said that the commission engaged in its broad inquiry under the commission's policy statement from 1999 that doesn't just look at precedent agreements, it does look at other benefits, and it applies what the commission calls a sliding scale, which means, and there is an environmental aspect as well, which is not an issue in this case, but before you even get to the environmental analysis, the commission looks at the market need, but usually by way of precedent agreements, the other benefits that the pipeline may provide, and weighs it against the adverse impacts, principally among those adverse impacts being eminent domain. Now in this case, in the original analysis, the commission made the point that yes, we had 59% subscription in the original analysis, 42% in the alternative analysis done on remand. We also have other benefits, and we're weighing... What do you mean by the other benefits? Well, in specific to this case, besides some of the benefits that might be more general to what an interstate pipeline provides, here in particular is the takeaway capacity for Appalachian Basin production, which has been constrained. The Utica and Marcellus Shale production region produces a could be economical gas, but it isn't where it needs to be in the markets that need more access to economic gas, such as the commission noted in the Midwest. By carrying this from Ohio, where it actually picks it up from Pennsylvania, West Virginia into Ohio, the pipeline runs from Ohio to Michigan, and it can serve customers in Michigan. It can connect to pipelines that would take it to Illinois and the upper Midwest, and give more access to a production area that has experienced constraints in that there's not enough takeaway capacity. Does the record support the proposition that it couldn't be taken away without this pipeline? I don't know that it couldn't be taken away without it, but there was evidence in the record of the bottle, besides the commission's just expertise under knowing what's going on in the from the Appalachian Basin. I know that Nexus had some evidence of that in its application. I believe I have sites for that that aren't in our joint appendix, I think, because they were an attachment to the application, but they were in the original case to Nexus's resource report, but the commission also was aware of that, and the commission cited it in the certificate order, specifically in... Okay, so the first JA from the previous case, it's at JA 309-310. I know you don't have that, but we could submit that if the court doesn't have access to it, but the commission also cited it in its certificate and remand orders, I believe. So there was evidence in the record, which again, as to the parts of the commission's balancing analysis, the Oberlin One Court affirmed that as having been done right. The only question was about the precedent agreements that were being counted. It's fantastic for its alternative ground for upholding the certificate. The commission did not consider why a smaller pipeline would not suffice to serve the domestic precedent agreements only. And since in your alternative reasoning, FERC was considering only the domestic precedent agreements, is it unreasonable for the commission not to have considered more specifically an analysis of a smaller pipeline? Actually, Your Honor, the same analysis it had done with the 59%, it did again in this order. And I would point in particular... I know footnote 73 on JA 383 gets into some of this. In the original analysis, because when the original environmental impact statement had been done, that includes a lot of the alternative analyses, it was done based on 1.5 million decatherms per day. So for the commission, redid parts of that analysis to account for the fact that at that time, they only had 885,000 decatherms per day subscribed. So the commission looked at the downsizing issue in the certificate and re-hearing orders. And it repeats it here. The difference between the 885, you're still doing the same pipeline route. You're still taking the same property. The difference would be as large a taking that is a question that I have is, would there be as much of a taking if you were using a smaller diameter pipeline? I believe that I wish I had a citation for this, and I can provide it later if the court wants it. But there was an analysis somewhere in the original record. If it's not in the orders, it might be the environmental impact statement. I think it's in the certificate order. The difference was maybe along the lines of 20 acres. The land taken for the pipeline, but it would be how many compressor stations and whether you could eliminate any of the compressor stations. And there might be some acreage around a compressor station that you could eliminate. That would be the effect of downsizing the pipeline. And the commission also pointed out that sometimes it doesn't make sense to downsize it if you might have to build a bigger pipeline in the future to accommodate demand in the future. So again, going to the sliding scale, if it had made a huge difference in the acreage or a large difference in the eminent domain, and they got 93% of the land required for this without exercising eminent domain, which the commission pointed out in the first case is quite high for one of these cases. So in the sliding scale of the amount of benefits, including not just the precedent agreements, but the other benefits like the takeaway capacity, balanced against the adverse impacts, the commission found that the balance made sense in this case. It might not in another case, in a case that required more like 30% eminent domain. I don't know if the analysis would be the same. It's very fact-based in each case. One other thing I would say with regard to the commission did look at the difference between 42. Commission staff in the environmental impact statements often makes this calculation looking at the publicly available capacity information on the website for pipelines in the area. Originally it did it to see if there was capacity for 1.5 anywhere and it said no. It then redid the same analysis in the first round at 885 and found there was not sufficient capacity available on other pipelines in the area and did it again for 625 for the remand. This is something commission staff does pretty routinely in putting together environmental impact statements. They do it using the same public websites that anyone can access to look at different pipelines in the area. I think they identified which pipelines they were in the original environmental impact statement. Those websites have fairly detailed information about pipeline capacity? I'm not familiar with them myself because we have expert staff that does that work. I don't know whether Mr. Super would have some knowledge of this when it's his time. They are required to put certain information about the capacity that's under contract versus available. I did check FERC staff isn't using some kind of proprietary information that only we have access to. It is publicly available information that the pipelines have on their websites. I see that I'm out of time. I did want to address the exports, especially if the court has any particular questions about that. I want to emphasize the commission did not rely on equivalency between section 3 and section 7. In fact, it expressly disavowed that in a foot but what the commission did is it said we're looking always for section 7. We're looking at domestic public benefits. The commission in its analysis found that exports with free trade countries, specifically Canada here and in this pipeline particularly, have benefits for the U.S. public. We're not talking about the benefits to Canadian customers. We're talking about the one I'll say in paragraph 20. When the commission says beyond the facts of the proceeding, it doesn't mean outside the facts of this proceeding. It means more generally including this proceeding. It talks about the benefit of free trade in gas imports and exports for U.S. customers. That goes back to the discussion on the previous page about the Don hub in particular that when gas goes to the Don hub, which is the second largest trading hub for natural gas in North America, a lot of it ends up back in the United States. Now we don't know when a particular particle of gas crosses the border. Does that one end up in New England or New York? We might not know about that particle but we know about the impact of free trade. You have to show something specific to this pipeline project though and not just the generic economic theory of benefit to U.S. public. Yes but it's also rather like your claim about or I don't have claims or the language about jobs being generated. That's always true in a construction project. That's not something that I think you so you'd be able to weigh and I'm not sure that what you're saying now is sufficiently specific to this pipeline to be worth the appropriate to weigh it in the sliding scale analysis. Well this is where the commission is looking at is it lawful for us to even consider precedent agreements for gas that may ultimately be exported. This is a commitment for 17 percent of what your capacity would be not exactly the case because that's the amount they've contracted that they could export. Yeah we pointed out in the first case and I didn't want to belabor it. You're relying on that amount as being a basis for a convenience and necessity and if that's going in the export it really can't be relied on can it? Well we know it's we don't know that gas doesn't always go to Canada. We were assuming for purposes of this discussion that it is. As a matter of fact they can sell it off at Ypsilanti or they can send it to the Donhub and send it back into the United States but the commission was looking at the benefits but when we're talking about the lawfulness of considering exports at all the commission was looking at whether it's reasonable for us the commission to find domestic benefit in the free flow of trade in particular here with Canada. Not just because it's in section three and Congress said something about in section three as well as in NAFTA and USMCA but the commission itself is making the finding that it does benefit US customers in addition to the other benefits this particular pipeline like the Appalachian Basin takeaway capacity and so the commission is just asking the question is it is it lawful and reasonable for us to include these two precedent agreements with the other six in assessing this particular pipeline? When it goes to lawfulness at any pipeline the section seven analysis of any pipeline has to stand or fall on the the merits of that factual analysis. The question here is are we going to preclude the commission from even considering the domestic benefits of exports as a matter of law or are we going to consider in a particular case that the commission may find benefits in those agreements that make sense to include them in the mix that we then apply the sliding scale analysis under the policy statement too. So that's why the commission made the case that not only is it in the domestic public interest to include these agreements but that the rest of the analysis this pipeline had already passed the commission's analysis and the court's review at the 59 percent with the weighing of the benefits versus the adverse impacts. It had already passed that in Oberlin one. The question is are we doing that with the 42 percent because the commission has to just pretend that exports have no domestic public interests even though it knows and has found that they do. So I think that's how the commission was looking at the question. All right. Thank you. Why don't we hear from intervener? Thank you your honor. David super on behalf of nexus please the court. Judge Centella I think I may start by answering one of your questions about evidence for the presence of a bottleneck for takeaway capacity out of the Appalachian Basin. And the commission did cite in the rehearing order to a resource report that was provided by nexus that provided evidence of that and unfortunately it's not in the joint appendix of this appeal but it was in the joint appendix of the last appeal and the information is at JA 311. I'm afraid that's the best I can do right now for that one you a citation. I think it's important though as Ms. Banta was saying to focus. I mean while the six precedent agreements for domestic delivery is representing 42 percent of capacity is important and can be relied upon by the commission as evidence of need. This case involves a wide variety of evidence of public need that the commission relied upon. And as Ms. Banta mentioned the takeaway relieving the takeaway constraints out of the Appalachian Basin was one of those points but the commission also found that the pipeline would provide northern Illinois and other midwestern markets with access to additional supplies of gas and those are tangible public benefits really at both ends of the pipeline alleviating a bottleneck on one end and enhancing markets in the midwest on another. And Judge Rogers I believe this is the evidence of public need that you were referring to in your concurrence in the first Oberlin opinion where you said here the commission's findings regarding the need for and the nature of the nexus pipeline are supported by substantial evidence in the record considered as a whole. I think it's important to emphasize that then commissioner now chairman Glick praised the fact that the commission was looking at all of the evidence and taking a holistic approach to looking at a wide variety of evidence of public need and not just looking at precedent agreements. And just seven months ago in the environmental defense fund case this court actually pointed to the nexus project as being supported by multiple market studies and the court described the evidence of the market demand in that case as much stronger it's much So yes the six domestic precedent agreements are significant evidence of need and the commission's reliance on those agreements deserves deference but here the nexus project is supported by additional evidence of need which on which the commission relied to find that the project was in the public convenience and necessity and that's even without considering the two precedent agreements that contemplate deliveries of gas to Canada. So that's an alternative determination that this court can rely upon to approve the nexus project. I see that my time is up. Happy to answer. Hearing none we'll hear from council for city of Oberlin. I'd like to respond to two points your honor. First with regard to the alternative analysis. Yes there are six precedent agreements here but we still can't tell from the record whether that gas can be transported on available capacity on neighboring pipelines. We raised that argument in detail on rehearing in the joint appendix at 614. FERC never acted on the rehearing and they never in their brief cited any uh any included any citations to what pipelines they looked at. Just saying that information is in the public record. The public record at FERC their docket sheet goes back 20 years. Their their their information on other pipelines is all over the place. We were not able to track down which pipelines FERC examined, what kind of capacity was there, any of their assumptions. On remand that the commission identified the specific existing pipelines on which it relied. I'm sorry your honor I didn't hear the first part of your question. Did you raise this question on remand? Yes your honor when the case was sent back to FERC. I know but my point is the commission said it looked at existing pipelines and determined there was not the capacity that was needed and you say but we don't know which other pipelines they looked at. Did you ask them? Yes in our rehearing request of the remand order. I understand that and when you didn't get what you wanted did you indicate that so FERC could respond? I mean raising it now before us isn't the same. Yes your honor I guess what I'm saying is in the we filed a remand we filed a rehearing petition of the FERC order for the remand order came out it said we relied on this public information. In our remand in our rehearing petition of that remand which is in joint appendix at JA 614 we said we can't tell what you looked at we don't know what assumptions you made. This was a case where FERC didn't issue an order on rehearing it this was one of the Allegheny cases that came straight to the court and so FERC didn't put anything in it on its brief either. So the record is open there but yes we did raise that argument because it was it's been something that had been nagging at me since Oberlin one when Oberlin one found that there was no available capacity for the 59%. I thought for sure that when it went back on 40% that would be addressed. So that's the first point. The second point is we're not suggesting that FERC can never take into account any of the benefits of export pipelines. It can do that but under section three section three is the appropriate place for it. If we take FERC's consideration of those benefits of exports to a logical extreme we're going to be in a situation of branding eminent domain for export pipelines and that's not appropriate and in fact our suggestion for relief here is to remand this case to FERC and to have it issue or consider whether to issue a section three pipeline. What I'm getting at is I understand your broad general statements but there you don't deny there's this bottleneck. You like anyone else can determine what pipelines serve that area and do they have the capacity and maybe you don't have all the detail and expertise that FERC does but this is not as though what I'm trying to get you to focus on is maybe you didn't get chapter and verse the way you wanted but it's not as though the commission was relying on pipelines in South America to find there was no capacity. They were looking at this region and what its needs were and these pipelines are large enough they can't be overlooked. So if there was any evidence that there was a capacity availability on existing pipelines why couldn't you have raised that before the commission? Again we weren't able to track that exact information because we didn't we don't need exact information. What you need is evidence that there's existing capacity and your proposition is FERC hasn't proved there is none. Well where is the evidence that there is any? Well it's very difficult to tell from this from public information. There's not necessarily sites that are easy to go to where you can see what kind of capacity was available if it was back in 2017 or now we just weren't able to. I appreciate that but I'm trying to understand what it is you wanted FERC to give you specifically when it has these staff reports and they're available to you and anyone else. That's all. I mean you're suggesting as I understand it that FERC is somehow pulling a fraud on the court. I don't see any evidence of that and I think at some point there is a burden to say you know you can't rely on South American pipelines here. We're talking about a particular region. What's going on in that region? What we're suggesting your honor is that the commission relied on information the source of they say public information which can encompass many different things. In the city of Williston gas the court held that if the commission doesn't specifically identify the source of its information then its conclusions are impervious to judicial review. I understand all that counsel. I'm trying to understand what happened here. We sent it back so all of this could be examined. All right and I just don't understand why this wasn't all worked out on remand. That's what I'm trying to understand. Well as I said your honor we did raise these issues in our. I hear you. I hear you. I've heard your. Okay I'm sorry your honor. No thank you. Thank you your honor. So we just hear from counsel for the commission. I want to get this clear in my own mind. The city has argued it raised this issue in its remand. It said we don't know what pipelines you're looking at. What did the commission say? Well they raised it on rehearing and the commission did not issue a rehearing order so we didn't say anything. All right they said look you say there isn't capacity on existing pipelines and the commission says we've looked at existing pipelines and determined that there is no such capacity. What pipeline? Well we had done it twice before and going back to the original environmental impact statement which I apologize I don't have it in front of me although I do recall that I was looking at page 1035. There's a section in the alternatives that says there are I believe it said six pipelines in this same area which could in theory serve the same path although it would require some laterals and some adjustments and some loops I believe it said. And that's the initial discussion where the commission looked for 1.5 million. Where the commission staff in the environmental impact statement. So I don't know whether there was an attachment somewhere later to the environmental impact statement that identified which six but it did say there are x number of pipelines I'm going by memory I do believe it was six in the area and we've looked at those and there aren't 1.5 million decatherms available cumulatively. And then so the commission did the same analysis at 885 and again at 625. And it was still looking at pipelines that could theoretically with some modifications serve the same path from Ohio to Michigan. Although it did note from the start that they couldn't just pick up the gas and take it there would be laterals and loops and various kinds of you couldn't go straight from here to there but you could maybe get from here to here to here to here to here there. And that's what the commission looked at and said there isn't enough capacity anyway and it did it at all three levels. So your response is it's in the record and council just needed to look more thoroughly? That we gave more detail in the original environmental impact statement which as you know is a long process with a lot of parties involved including Oberlin. Yeah well but you've heard council for the city it said we couldn't tell which existing pipelines the commission looked at. And what I hear you saying is well uh it was part of the EIS the original one and the revised one so it was all there. And it was and and it was cited in the certificate order and I think uh we didn't when this when the case came before this court in the first the first time the court did say that the commission had conducted its analysis reasonably and really only had questions about counting the export agreements or whether 42% would be enough. So I think the commission didn't start from zero it didn't start as though or a new yeah. All right thank you. All right anything further my colleagues would want to ask? Well we'll take the case under advisement then. Thank you council.
judges: Rogers, Rao, Sentelle